UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

RUSSELL LEE ROBERTS,        )
                            )
            Plaintiff,      )
                            )        No. 4:12-cv-24
v.                          )
                            )        *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY,   )
                            )
            Defendant.      )

## REPORT AND RECOMMENDATION

Plaintiff Russell Lee Roberts brought this action pursuant to 42 U.S.C. §§ 405(g) seeking

judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying him disability insurance benefits ("DIB") and supplemental security income

("SSI"). Plaintiff has filed a motion for judgment on the pleadings [Doc. 15] and Defendant has

moved for summary judgment [Doc. 17]. Plaintiff alleges the Administrative Law Judge ("ALJ")

improperly rejected the opinions of his treating mental health physicians, erred in addressing

Plaintiff's physical conditions and concluding Plaintiff could perform medium work, and did not

adequately consider Plaintiff's subjective complaints. For the reasons stated below, I

**RECOMMEND** that (1) Plaintiff's motion for judgment on the pleadings [Doc. 15] be **DENIED**;

(2) the Commissioner's motion for summary judgment [Doc. 17] be **GRANTED**; and (3) the

decision of the Commissioner be **AFFIRMED**.

## I.    ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed his application for DIB and SSI on October 29, 2008, alleging

disability as of January 1, 2007 (Transcript ("Tr.") 128-37). Plaintiff's claim was denied initially

and upon reconsideration and he requested a hearing before the ALJ (Tr. 57-68, 70-71, 75-80). The

ALJ held a hearing on July 20, 2011, during which Plaintiff was represented by an attorney (Tr. 27-54). The ALJ issued his decision on July 29, 2011 and determined Plaintiff was not disabled because there were jobs in significant numbers in the economy which he could perform (Tr. 7-21). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-3). Plaintiff filed the instant action on April 2, 2012 [Doc. 2].

## II.    FACTUAL BACKGROUND

### A.    Education and Background

Plaintiff was 53 at the time of the ALJ's hearing and had a GED diploma (Tr. 30-31). Plaintiff had previously worked as a plumber and part-time as a roofer and had last worked in 2008 (Tr. 31-32). Plaintiff testified he was disabled because of excruciating back pain that radiated to his buttocks, right leg and foot and caused his leg to go numb (Tr. 33-34, 40). Plaintiff testified the back pain was caused by a herniated disc and may have started after he picked up a water heater in 2008 (Tr. 34-36, 40). Plaintiff was on medication for his back that made him drowsy and had problems sleeping; he usually only slept four hours a night (Tr. 36, 40-41). Plaintiff estimated he could only lift about four pounds and that even lifting a gallon of milk hurt; he could stand for about two hours in an eight hour day and could sit for about two hours and could only walk for about 10-15 minutes at a time (Tr. 43-44). Plaintiff testified he could not bend down and would have problems getting up after squatting or kneeling (Tr. 44). Reaching overhead would make his back hurt (Tr. 44). Plaintiff testified his back pain would prevent him from working even without his mental problems (Tr. 45).

Plaintiff further testified that mental problems kept him from working because he had mood

swings, nightmares, post traumatic stress disorder ("PTSD"), had been diagnosed with bipolar disorder and depression, and had crying spells about twice a week for a couple of hours at a time (Tr. 36-37, 41). Plaintiff explained the PTSD stemmed from the traumatic stillbirth of one twin daughter, the birth of another daughter who died, and his mother's death; the symptoms had persisted for years and bothered him while he was working (Tr. 37-38, 42). Plaintiff testified he was in group therapy and his mental symptoms were not worsening, but he had problems getting along with people and maintaining concentration and sometimes had manic phases (Tr. 38, 42). Plaintiff believed his mental symptoms would prevent him from working even if he did not have back pain (Tr. 44-45).

Plaintiff smoked a pack or a pack and a half of cigarettes daily and had not used drugs since high school (Tr. 39). He had not looked for work at all in the past couple of years (Tr. 39). Plaintiff did not have health insurance, relied on a friend for money, and received food stamps (Tr. 45, 49). He lived alone in a small camper trailer he owned and did any chores himself, drove, and went grocery shopping twice a month (Tr. 47-49). Plaintiff spent his time watching TV and did not often get out to visit friends or family, only visiting the friend who loaned him money twice a month (Tr. 48).

B.        **Vocational Expert Testimony**

The ALJ solicited the testimony of vocational expert Dr. Richard Hark (the "VE") during the hearing. The ALJ first asked the VE to assume an individual who could perform medium work but required an option to sit or stand at will without leaving the work station, and had psychological limitations that required simple, repetitive tasks, minimal contact with others and primarily dealing with things rather than people, infrequent work changes, and no rigorous production quotas (Tr. 50). The VE could not identify any medium work with a sit/stand at will option, but noted there were

several light work jobs with that option and identified three specifically (Tr. 51). The ALJ changed the hypothetical slightly to a sit/stand option accommodated with normally-allowed work breaks and asked the VE if medium jobs would be available for this individual (Tr. 51). The VE testified that such an individual could work as a kitchen helper, with 4,000 jobs in the region and over 500,000 nationally; a floor cleaner/waxer, with 6,000 jobs regionally and 400,000 nationally; or a linen room attendant, with 1,500 in the region and 200,000 in the nation (Tr. 52). The VE testified that if the individual could not maintain concentration on unskilled job tasks for two hours at a time, there would be no jobs available (Tr. 52). The VE further testified that there would be no jobs available if Plaintiff's testimony were found to be credible (Tr. 53). Similarly, all work would be eliminated if the individual were having crying spells two to three times a week lasting up to two hours at a time (Tr. 53).

### C. Medical Records

#### 1. Physical

An ultrasound in August 2008 showed a two millimeter cyst in Plaintiff's left testicle and in September and October 2008, Plaintiff presented with an easily visible and tender left inguinal hernia at Nashville Surgical Associates and Middle Tennessee Medical Center (Tr. 236-65). A CT scan of Plaintiff's abdomen and pelvis on November 25, 2008 showed the left inguinal hernia, sigmoid diverticulosis, and findings suspicious of disc bulges or protrusions at L3-L4 and L4-L5 (Tr. 266-67).

On January 9, 2009, state agency physician Dr. Cassandra Comer reviewed Plaintiff's records and opined his physical impairments were nonsevere (Tr. 291-92). Plaintiff established with Dr. Gilbert Aragon in March 2009 and it was noted that Plaintiff had a left inguinal hernia that was

repaired, a herniated cervical and thoracic disk, borderline hypertension, chronic pain, and seizure disorder (Tr. 293). On exam, Dr. Aragon noted cervical and thoracic pain and decreased range of motion (Tr. 293). Dr. Aragon refilled Lortab and prescribed Valium and Depakote (Tr. 293). During his appointment on April 22, 2009, stable bipolar disorder and herniated lumbrosacral disk are noted as diagnoses (Tr. 293). Anxiety was noted in June 2009 and tenderness from L1 to S4 was noted in July 2009 (Tr. 294). Plaintiff did not return for his next appointment with Dr. Aragon and in May 2010, his records were transferred to Unionville Family Practice (Tr. 341-43). Plaintiff filled out a function report on July 12, 2009 and reported he could feed his dog, watch TV, attend to his personal needs, prepare meals, perform light housework and laundry weekly or bi-weekly, go outside, drive, go to the grocery store alone, pay bills, and otherwise handle money (Tr. 207-14).

On September 30, 2009, Plaintiff submitted to a medical examination with Dr. Woodrow Wilson (Tr. 321-24). Plaintiff reported a history of neck and back pain following a car accident in 2001 and stated the pain radiated to his right leg and made it numb and he was told he had two herniated discs after a CT scan and an MRI (Tr. 321). Plaintiff reported an MRI of his neck in 2001 and stated he was told there were muscle tears, but he had had no surgery for his back or neck issues (Tr. 321). Plaintiff also reported difficulty sleeping, decreased hearing in his right ear, possible seizure disorder based on three episodes in 1985, history of flat feet, and history of inguinal hernia since 2001 (Tr. 321). Dr. Wilson observed it was unclear whether Plaintiff was putting forth good effort during examination due to his slow and deliberate movements, but he was able to get out of the chair without much difficulty and had a good stride (Tr. 322-23). Plaintiff was able to tandem walk with a little difficulty, stand on his toes and back on his heels, and bear weight on each foot independently (Tr. 323). Plaintiff complained of right shoulder pain but his range of motion was

good (Tr. 323). Plaintiff had a full range of motion in his knees and ankles, but reduced range of motion with his back and complained of pain upon motion (Tr. 324). Dr. Wilson diagnosed Plaintiff with chronic neck and back pain that was probably the result of degenerative disc disease, but had no records to substantiate this diagnosis; passing out spells that had not been a problem for 20-25 years; decreased hearing in the right ear; insomnia; and history of hypertension (Tr. 324).

Dr. Wilson filled out a medical source statement and opined Plaintiff could do the following: continuously lift up to 10 pounds and occasionally lift up to 50 pounds; carry up to 20 pounds continuously and up to 50 pounds frequently; sit or stand for an hour at a time for a total of five hours in an eight hour day; walk for a total of 15-20 minutes at a time for a total of two hours in an eight hour day; and had no limitations with the use of his hands or feet except he could only frequently reach overhead with his right hand (Tr. 325-37). Plaintiff could never climb ladders or scaffolds, only frequently balance, and only occasionally stoop, kneel, crouch, or crawl (Tr. 327). Plaintiff retained the ability to hear and understand simple oral instructions and communicate simple information (Tr. 328). Plaintiff could never be around unprotected heights, could only frequently be around humidity, wetness, dust, odors, or fumes, or extreme heat, and could only occasionally be in extreme cold (Tr. 328-29). Dr. Wilson finally opined Plaintiff's limitations would last for at least 12 months (Tr. 330).

On December 17, 2009, Dr. Joe Allison filled out a physical residual functional capacity form (Tr. 332-40). Dr. Allison opined Plaintiff could occasionally lift and/or carry up to 50 pounds and could frequently lift and/or carry up to 25 pounds; stand and/or walk for a total of about six hours in an eight hour day; sit for a total of about six hours in an eight hour day; and was unlimited in all other areas except he could only occasionally climb ladders, ropes or scaffolds (Tr. 333-36).

Dr. Allison opined Plaintiff's subjective complaints were only partially credible because they were not supported by the record, and Dr. Wilson's assessment was too restrictive, as it was not supported by his findings on examination (Tr. 339).

In January 2010, Plaintiff began following with Unionville Family Practice and sought refills on his medication; he reported a back injury and hernia in 2008 and stated he was taking Lortab and Valium (Tr. 347). Plaintiff's assessment included disc herniation of his lumbar spine, low back pain with radiculopathy and inguinal hernia and he was prescribed different medication (Tr. 347). Valium was discontinued because the physician assistant did not want to write a prescription for it as it could be abused (Tr. 347). Plaintiff returned for refills on medication on February 25, 2010 and anxiety was added to his assessment; Plaintiff was prescribed Buspar as the physician assistant again told Plaintiff she was not comfortable prescribing Valium (Tr. 348). On March 30, 2010, Plaintiff reported no change in his anxiety with Buspar and Valium was finally prescribed; Plaintiff reported it helped with his leg pain and numbness (Tr. 349). Plaintiff reported the Valium was helping with his nerves and leg pain in May and July 2010; he was walking with a limp in May, and in July, PTSD was added to his assessment (Tr. 352-53). During his appointment October 12, 2010, Plaintiff reported throwing his back out a few weeks ago and right leg numbness (Tr. 351). On January 1, 2011, Plaintiff reported both legs would go numb and his right leg would stay numb, he was walking with a limp, and he had difficulty sitting down and getting back up (Tr. 350). During an appointment May 10, 2011, Plaintiff reported his pain was six out of 10 on a good day and he had increased hernia pain with constipation (Tr. 451).

### 2. Mental

Records from Volunteer Behavioral Health Care System in 2007 and 2008 indicate Plaintiff

was diagnosed with bipolar II disorder, PTSD and polysubstance dependence and tried various medications to alleviate his symptoms. In April, Plaintiff was tearful at times, described difficulties sleeping, and his Global Assessment of Functioning ("GAF") score was 50[1] (Tr. 268-69). Plaintiff was doing better in May 2007, although his medication was not working as well (Tr. 270-71). On September 10, 2008, Plaintiff requested a case manager and was not currently taking any medications for his mental health symptoms; his GAF was 61 (Tr. 272-73). Plaintiff was described Depakote during his session in December 2008, during which he reported being asocial with racing thoughts and was unable to afford surgery for his hernia (Tr. 274-75).

Reviewing psychiatrist Dr. William Meneese completed psychiatric review technique and mental residual functional capacity ("MRFC") assessment forms on January 7, 2009 (Tr. 276-90). Dr. Meneese opined Plaintiff had moderate limitations in social functioning and maintaining concentration, persistence and pace, and mild limitations in activities of daily living (Tr. 284). Dr. Meneese further opined the records did not support a disabling mental illness and Plaintiff's complaints were only partially credible, as Plaintiff appeared to have only mild to moderate limitations (Tr. 286). In the MRFC, Dr. Meneese more specifically opined Plaintiff was moderately limited in the following abilities: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; working in coordination with others without being distracted by them; interacting appropriately with the general public; accepting

---

[1]     A GAF score between 31 and 40 indicates "some impairment in reality testing or communication" or a "major impairment in several areas," a GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others (Tr. 288-89). Otherwise, Plaintiff was not significantly limited (Tr. 288-89). Dr. Meneese noted that Plaintiff could understand, remember and carry out short and simple instructions; could maintain attention to complete simple tasks without special supervision; needed a flexible shift daily schedule and a well-spaced work setting; could tolerate non-intense interaction with all groups of people; needed non-confrontational supervision; could tolerate gradual changes in the work setting; and could set simple, short-term work goals (Tr. 290). Dr. Meneese's assessment was affirmed on November 11, 2009 (Tr. 331).

In April 2009, Plaintiff sought treatment from Tri-County Community Services Inc. and diagnoses of bipolar disorder and PTSD were noted (Tr. 298-99). Plaintiff's initial evaluation took place on April 29, 2009 and Plaintiff described having mood swings when stressed; recurrent depression with feelings of helplessness, crying spells, insomnia, and decreased appetite and energy; and episodes of high energy that would last a few days at a time with no need for sleep and increased productivity (Tr. 305-07). Plaintiff also described nightmares and flashbacks that were only alleviated with Lamictal (Tr. 305). Plaintiff was not currently taking illicit drugs but had used marijuana two to three years prior; he had stopped drinking 14-15 years prior (Tr. 305). Plaintiff had a past psychiatric hospitalization in 2001 (Tr. 306). Lamictal was prescribed (Tr. 307). During a session on May 13, 2009, Plaintiff felt he was being stigmatized as a felon, was frustrated that he could not work, and was stressed that he had not gotten disability yet (Tr. 304). He reported sleeping five hours a night and had not started taking Lamictal (Tr. 304). In early June 2009,

Plaintiff reported that he had stopped taking Lamictal for a few days; it was discontinued and Abilify was prescribed, but Plaintiff reported he was afraid to take the Abilify on June 11 and was prescribed Depakote (Tr. 302-03). Plaintiff was having pain from his hernia on July 1, 2009 and was experiencing side effects from Depakote; he was also having financial issues (Tr. 301). On July 23, 2009, Plaintiff reported stress and appeared depressed; he was prescribed Lamictal again (Tr. 300).

Plaintiff presented for an intake session at Centerstone on August 17, 2009 (Tr. 309-19). The Clinically Related Group ("CRG") form indicates Plaintiff had marked limitations in activities of daily living, as he reported he would stay in bed for days at a time; extreme limitations in interpersonal functioning because he was openly hostile with others; marked limitations in concentration based on reports that his manic symptoms made concentration difficult; and marked limitations in adapting to changes based on Plaintiff's report that even minor changes could cause significant drops in functioning (Tr. 309-11). Plaintiff was designated to be in the group of persons with severe and persistent mental illness and his current GAF was 39 (Tr. 311). Other information from Plaintiff's intake session indicates he was living at his friend's deer stand and had no permanent residence; he had been diagnosed with bipolar disorder eight years prior and things had gone downhill after that; he had a long history of treatment for depression and experienced crying spells, decreased appetite, poor sleep, and nightmares; his manic phases were followed by days where he would just stay in bed; he had difficulty staying in a job; he had a history of sexual abuse that he refused to discuss; he had several stitches in his head from various head injuries; and his problems became apparent after he stopped drinking 14-15 years ago (Tr. 312-16). Plaintiff became hostile and agitated during his intake session and refused to discuss some of his past problems; he

was diagnosed with bipolar II disorder, depressed, PTSD, acute, and personality disorder, not otherwise specified (Tr. 316-19).

During a psychiatric evaluation on September 8, 2009, Plaintiff recounted much of the same history and his GAF was 44; Neurontin was prescribed (Tr. 365-69). Plaintiff did not show up or cancelled a couple of appointments in October 2009, but he generally attended individual therapy, group therapy, medication, and case management appointments from August through November 2009 (Tr. 388-98, 404-16). In October 2009, Plaintiff was angry during sessions, reported he was not having problems with depression or anxiety, but was angry and threatening towards people and agencies who were doing him wrong and was aggravated with the delays in his disability claim (Tr. 399-403). Plaintiff was scheduled for therapy sessions later in 2009, but did not show up for several appointments and his file was closed; in 2010, Plaintiff did start attending group therapy sessions again (Tr. 375-87).

Plaintiff's GAF was noted to be 44 in January 2010 (Tr. 370-73). On July 15, 2010, Plaintiff's GAF was estimated at 48 (Tr. 440-43). On July 29, 2010, Sherry Walker, LCSW, wrote a letter regarding Plaintiff's treatment at Centerstone that essentially summarized his intake session and noted he was participating in bi-weekly group therapy supplemented with individual therapy (Tr. 354). On the same date, Plaintiff's GAF was estimated to be 55 on one form, but a CRG form was filled out with a GAF of 52, and Plaintiff's lowest GAF in the last six months was 48 (Tr. 418, 436-38). The CRG form noted Plaintiff had moderate limitations in activities of daily living based on mood instability that interfered with task completion; marked limitations in interpersonal functioning because he relied on Centerstone for social support, had limited social contacts, and his mood instability affected relationships; moderate limitations in concentration due to cognitive

11

distortions and mood instability; and marked limitations in adapting to change due to his disproportionate emotional reactions to small changes or delays (Tr. 436-38). Plaintiff remained classified in the group of persons with severe and persistent mental illness (Tr. 438).

Plaintiff continued attending group therapy sessions from April 2010 to May 2011, but missed or cancelled other appointments; he often expressed dissatisfaction with his disability lawyer during group sessions (Tr. 424-25, 429, 444-50, 462, 468, 472, 476-79). During this time frame, Plaintiff's GAF was 55 in both January and May 2011 (Tr. 420-23, 458-61). Plaintiff's case management sessions in April through June 2011 centered on housing and his frustration that he had not gotten disability yet (Tr. 455-56, 463-64, 466-67, 473-74). On June 2, 2011, Plaintiff reported the medication was helping, he was getting out and visiting friends, and was growing tomatoes, which helped with stress (Tr. 455-56).

## III.    ALJ'S FINDINGS

### A.    Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

> 5) If the claimant can make an adjustment to other work, the claimant
> is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### B.  ALJ's Application of the Sequential Evaluation Process

At step one of this process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since January 1, 2007, the alleged onset date (Tr. 12).[2] At step two, the ALJ found Plaintiff had the following severe impairments: back disorder, bipolar disorder, post traumatic stress disorder, and personality disorder not otherwise specified (Tr. 12). The ALJ determined these impairments were severe because they caused significant limitations in Plaintiff's ability to perform basic work activities (Tr. 12). The ALJ noted he did not find Plaintiff to have any severe impairment caused by a hernia (Tr. 12-13). At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 13). The ALJ specifically discussed his consideration of Plaintiff's mental impairments and Listings 12.04, 12.06, and 12.08 (Tr. 13). The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform medium work with a sit/stand option to be accommodated with normally allowed breaks, but was

---

[2] During the hearing before the ALJ, Plaintiff requested his onset date be amended to July 24, 2008 based on work Plaintiff had performed in 2008 (Tr. 31). The ALJ's decision reflects an onset date of January 1, 2007 because he found the work performed in 2008 did not rise to the level of substantial gainful activity.

limited to simple, repetitive tasks; minimal contact with others in the workplace and working primarily with things rather than people; infrequent work changes; and no rigorous production quotas (Tr. 13-14).  At step four, the ALJ found Plaintiff was unable to perform any of his past relevant work (Tr. 19).  At step five, the ALJ noted Plaintiff was age 49, a younger individual, as of the disability onset date (Tr. 19).  After considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 20).  This finding led to the ALJ's determination that Plaintiff was not under a disability from January 1, 2007, the alleged onset date, through the date of the decision (Tr. 20).

## IV.  ANALYSIS

Plaintiff asserts four arguments that can be addressed in three categories.  First, Plaintiff argues the ALJ failed to give proper weight to his treating mental health providers.  Second, Plaintiff argues the ALJ minimized his physical impairments and, as a companion argument, Plaintiff argues the ALJ fashioned an improper RFC that was inconsistent with the evidence of his physical impairments.  Third, Plaintiff argues the ALJ did not adequately consider Plaintiff's subjective complaints and improperly found his statements to not be credible.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence.  42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389,

401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

**B.      Treating Mental Health Providers**

Plaintiff first argues the ALJ failed to consider the evidence of his mental illness, particularly his very low GAF scores and the CRG assessments from 2009 and beyond [Doc. 16 at PageID# 65]. To support this argument, Plaintiff points to all his mental health records, including records from Centerstone, which indicate marked limitations on his CRG assessments and one GAF score of 39 [*id.* at PageID# 65-66]. The Commissioner asserts the ALJ properly addressed the mental health evidence in the record because the GAF scores were assigned by mental health providers who are not acceptable medical sources, the ALJ gave specific reasons for rejecting various GAF scores, and there is no evidence to establish limitations in mental functioning beyond those found by the ALJ because GAF scores do not translate to work-related limitations [Doc. 18 at PageID# 80-81]. The Commissioner asserts the ALJ incorporated appropriate restrictions in his RFC determination and the adoption of these restrictions is supported by substantial evidence [*id.* at PageID# 81]. Moreover, the Commissioner argues the ALJ's decision to give the CRG assessment little weight is supported by substantial evidence in the record which indicates Plaintiff had only moderate mental limitations [*id.* at PageID# 82].

The law governing the treating source rule is not properly at issue here because the regulations are clear that a "treating source" means "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Acceptable medical sources are defined in 20 C.F.R. § 416.913(a) and 20 C.F.R. § 404.1513(a) to include licensed physicians and licensed psychologists. It does not appear Plaintiff ever had any ongoing treatment with a psychologist or psychiatrist at any of his mental health

providers and, therefore, there does not appear to be any opinion from an acceptable medical source providing Plaintiff with mental health treatment which the ALJ would need to give weight pursuant to the treating physician rule. Instead, the ALJ had the opinion of Dr. Meneese, a state agency consultant, to which he gave considerable weight, and treatment notes from other providers, including the Centerstone CRG assessment and GAF scores (Tr. 16). With respect to the Centerstone records, which form the basis for Plaintiff's argument, the ALJ noted several missed appointments, gave the CRG assessments of marked limitations little weight, and further noted the most recent Centerstone records indicated moderate symptoms, a moderate GAF score, and improvement (Tr. 18).

It is true Plaintiff received a GAF score of 39 upon initial assessment at Centerstone and has received the following GAF scores throughout his mental health treatment, respectively: 50, 61, 39, 44, 44, 48, 55, 52, 55, and 55. However, "[a] GAF score represents a 'snapshot' of a person's 'overall psychological functioning' at or near the time of the evaluation . . . '[a]s such . . . [it] is isolated to a relatively brief period of time, rather than being significantly probative of a person's ability to perform mental work activities on a full-time basis.'" *Hedger v. Astrue*, No. 2:10-cv-1026, 2012 WL 468546, at *9 (S.D. Ohio Feb. 13, 2012) (quoting *Martin v. Comm'r of Soc. Sec.*, 61 F. App'x 191, 194 n. 2 (6th Cir. 2003) and *Arnold v. Astrue*, No. 10-cv-13, 2010 WL 5812957, at *8 (S.D. Ohio. Oct. 7, 2010)). In addressing the mental health evidence in the context of Plaintiff's credibility, the ALJ pointed out that Plaintiff was able to work for years after the traumatic events he complained of which led to PTSD, had sporadic mental health treatment until after he filed for disability, did not always comply with medication and missed mental health appointments, and was exhibiting moderate symptoms and improved GAF scores with Centerstone treatment (Tr. 18-19).

Indeed, the last year of mental health treatment in the record indicates improvement and GAF scores almost consistently in the moderate range.

Although Plaintiff argues the ALJ improperly relied upon records from 2007 in lieu of records from Centerstone in 2009 [Doc. 16 at PageID# 65], in his decision the ALJ noted Plaintiff's mental health treatment was sporadic between 2007 and 2009 and referenced a statement Plaintiff made at a mental health treatment session in 2008 about not being able to get regular work (Tr. 18). There is no indication from the ALJ's opinion that he unreasonably relied upon these older mental health records to find Plaintiff's mental impairments were not disabling and, in fact, the ALJ noted Plaintiff's GAF score of 50 in 2007 indicated serious symptoms (Tr. 15). However, the ALJ also noted Plaintiff's GAF remained at 61 for the duration of his treatment in 2008 (Tr. 15). The ALJ further acknowledged Plaintiff's treatment at Tri County Community Services in early to mid 2009, which did not indicate any severe symptoms, as compared to his treatment from Centerstone and intake GAF of 39 in August 2009 (Tr. 15-16). Given the history of Plaintiff's mental health treatment to August 2009, I **FIND** the ALJ reasonably gave little weight to the CRG form and GAF of 39 and did not unreasonably favor older records to the exclusion of more recent indications of Plaintiff's symptoms.

In addition, I **FIND** the ALJ reasonably gave little weight to the marked limitations indicated on the latest CRG form because it appears this form was filled out based on Plaintiff's subjective complaints, which the ALJ found to be not entirely credible (as discussed *infra*), and marked limitations were inconsistent with Plaintiff's mental health treatment records and the other circumstances noted above, i.e, missed appointments, sporadic treatment, and improved GAF scores. Moreover, the ALJ incorporated restrictions in his RFC determination to accommodate any

limitations due to mental conditions; specifically, Plaintiff was restricted to simple, repetitive tasks, minimal contact with others in the workplace so that he would deal with things other than people, infrequent work changes, and no rigorous production quotas (Tr. 13-14). I **FIND** these restrictions adequately address any non-exertional limitations caused by Plaintiff's mental conditions and I further **FIND** the record does not support more significant limitations.

Accordingly, I **FIND** the ALJ adequately considered all the mental health evidence in the record. I also **CONCLUDE** the ALJ did not err in his assessment of Plaintiff's GAF score of 39 or the CRG forms and his decision to give this mental health evidence little weight is supported by substantial evidence.

### C. Plaintiff's Physical Conditions and the ALJ's RFC Determination

Plaintiff next argues the ALJ improperly concluded there was no evidence of a herniated disc because three different physicians diagnosed Plaintiff with a herniated disc [Doc. 16 at PageID# 67]. Plaintiff points to a few other medical records in apparent support of his argument that the ALJ minimized his physical impairments [*id.*]. In a companion argument, Plaintiff argues the ALJ's RFC determination is flawed because medium work has to involve a good deal of standing and walking and the jobs identified by the VE do not accommodate a sit or stand option [*id.* at PageID# 70-71]. Plaintiff asserts the ALJ's statement that a sit/stand option would be accommodated by normal breaks defies logic [*id.*] Finally, Plaintiff argues the ALJ failed to consider all the evidence in making his RFC determination and only favored evidence that indicated Plaintiff was not disabled [*id.* at PageID# 71].

The Commissioner contends the ALJ acknowledged that Plaintiff's physicians diagnosed him with a herniated disc, but there was no objective evidence, such as an MRI or CT scan, to

substantiate that diagnosis [Doc. 18 at PageID# 82-83]. Thus, the Commissioner argues the ALJ's decision to give the diagnosis little weight was factually accurate, based on a lack of objective evidence, and supported the conclusion that Plaintiff's back problems were not disabling [*id.* at PageID# 83]. Even so, the Commissioner points out the ALJ still found Plaintiff had a severe back impairment and considered limitations from that impairment when he limited Plaintiff to medium work [*id.*]. The Commissioner argues the medical records referenced by Plaintiff do not establish the ALJ erred in considering any of Plaintiff's other physical impairments because diagnoses are no indication of the severity of the condition and the ALJ considered all of Plaintiff's impairments [*id.* at PageID# 84]. The Commissioner further argues the ALJ's determination that Plaintiff can perform medium work is supported by substantial evidence because the objective evidence, Plaintiff's reports of daily activities, and the opinion of the state agency physician show only mild impairments [Doc. 18 at PageID# 88-89].

The Commissioner contends the inclusion of a sit/stand option to be accommodated by normal breaks would encompass all jobs, but Plaintiff has not shown its inclusion in the RFC determination was error; moreover, the Commissioner asserts it should not have been construed as a sit/stand option at will because the hearing testimony shows the ALJ intended the RFC to be as written [*id.* at PageID# 89]. The Commissioner notes the ALJ first asked the VE if medium jobs would accommodate a sit/stand option at will and the VE testified no medium jobs would accommodate that restriction, leading the ALJ to ask about medium jobs which would permit a sit/stand option accommodated by normal breaks [*id.* at PageID# 89-90]. The ALJ's hypothetical thus mirrors the eventual RFC determination [*id.* at PageID# 90]. The Commissioner finally argues the ALJ considered the entire record in making his RFC determination and, even if he did not

explicitly discuss every piece of evidence, it does not mean it was not considered [*id.* at PageID# 90-91].

The ALJ noted in his decision that "[w]hile progress notes from Gilbert Aragon, D.O., dated 2009-2010, document the claimant's herniated lumbrosacral disk, there was no objective evidence via x-ray, CT or MRI that supports this" (Tr. 15). The ALJ further concluded that "the assessment of disc herniation of the spine is not supported by objective evidence such as an MRI or an x-ray and appears to be based primarily on the complaints [sic] subjective complaints" (Tr. 17). The ALJ's statement that no records supported Plaintiff's report (and apparently diagnoses) of herniated discs is accurate; the only record available to the ALJ which spoke to Plaintiff's back condition was the CT of his abdomen in November 2008 to address hernia pain, which also revealed findings suspicious of disc bulges or protrusion at L3-L4 and L4-L5 (Tr. 15, 266-67). Other than this CT scan, there are no other scans of Plaintiff's back to support a diagnosis of herniated discs. Although Plaintiff told Dr. Wilson he was told he had two herniated discs after a CT scan and an MRI of his back, these scans simply do not appear in the record and it is unclear who ordered the scans or told Plaintiff of these diagnoses (Tr. 321). Similarly, Plaintiff referenced an MRI of his neck and reported muscle tears, but this scan also does not appear in the record (Tr. 321). Dr. Wilson indicated Plaintiff had chronic neck and back pain that was probably the result of degenerative disc disease, but he had no records to substantiate that diagnosis (Tr. 324). Essentially, it appears Plaintiff may have received the diagnosis from an unknown doctor and reported this diagnosis to other doctors as well, but there is no objective evidence in the record before the ALJ which would support the diagnosis. Therefore, I **FIND** the ALJ's conclusion with respect to the diagnosis of herniated discs is not in error.

Upon consideration of the other evidence of physical impairments in the record, the ALJ noted again that there were no MRIs or x-rays in the record to provide a definitive diagnosis as to Plaintiff's alleged back problems, and observed the CT scan from November 2008 was the only "objective abnormality" because it was suspicious of disc bulges or protrusions (Tr. 18). Moreover, the ALJ observed the CT scan of Plaintiff's abdomen also revealed mild spondylitic changes within the whole lumbar spine (Tr. 15, 266-67). The ALJ noted that he gave the opinion of Dr. Wilson minimal weight because the "findings and opinions are only partially objectively supported" and "are too restrictive and are not supported by his examination" (Tr. 17). The ALJ adopted the assessment of Dr. Allison with the addition of a sit/stand option and further summarized the medical evidence before stating "I find that the option can be accommodated within normally allowed work breaks, i.e., at 15-minute break in the mornings and the afternoons and a 30 minute lunch break" (Tr. 17). The ALJ also noted there was no medical opinion from a treating physician to opine Plaintiff was disabled (Tr. 19). The ALJ concluded that "the claimant has essentially received symptomatic treatment, chiefly medication refills, from primary care. The claimant has received routine and conservative treatment and has not undergone back surgery for his alleged back condition" (Tr. 18). Nonetheless, as the Commissioner points out, the ALJ did determine Plaintiff had a severe impairment of a back disorder and considered Plaintiff's complaints of back pain in limiting him to medium work (Tr. 12).

As such, I **FIND** the ALJ addressed all the medical evidence in the record in analyzing Plaintiff's physical abilities and reaching his RFC determination that Plaintiff could perform medium work. As noted above, there is essentially no definitive objective scan of Plaintiff's back in the record to establish the origin of the back pain of which he complains. The one CT scan

available shows mild changes and the possibility of disc bulges, but is not definitive of any herniated discs. Plaintiff has received somewhat sporadic and conservative treatment for his back pain, seeking medication refills from a primary care provider on, most recently, a quarterly basis, and there was a fairly lengthy amount of time (from July 2009 to January 2010) where Plaintiff apparently received no treatment or medication for his physical complaints. At times, Plaintiff complained the back pain radiated and caused numbness in his legs, but the ALJ noted there was no support for the claim of radiculopathy (Tr. 17). Dr. Wilson's opinion, which the ALJ gave minimal weight, is not in line with his results on examination and appears to have been based at least in part on Plaintiff's reports of diagnoses which were unsubstantiated by any records. Essentially, therefore, the ALJ's determination of Plaintiff's physical impairments involves the ALJ's assessment of Plaintiff's credibility, as discussed *infra*.

Based on the evidence of record, I **FIND** the ALJ's determination that Plaintiff could perform a range of medium work is supported by substantial evidence. I further **FIND** no error in the ALJ's inclusion of a sit/stand option to be accommodated by normal breaks. This was addressed in the ALJ's second hypothetical to the VE which identified medium jobs the hypothetical individual could perform and, as the Commissioner notes, all jobs would accommodate a sit/stand option at regularly scheduled breaks. Although the opinion may be somewhat confusing because the ALJ first noted he adopted the assessment of Dr. Allison with the addition of a sit/stand option, the ALJ clarified in the next paragraph that the option could be accommodated by normally allowed work breaks (Tr. 17). By including this "restriction" in his RFC determination, the ALJ was not making a determination that Plaintiff could not sit, stand or walk for any reduced length of time within the range of medium work. Accordingly, I **CONCLUDE** the ALJ did not err in concluding Plaintiff

could perform medium work to be reduced only by his non-exertional limitations.

### D. Credibility Determination

Plaintiff last argues the ALJ did not comply with the applicable Social Security Ruling in assessing Plaintiff's credibility [Doc. 16 at PageID# 68-69]. Instead, Plaintiff asserts the ALJ merely stated he used the proper criteria without specifically stating the weight given to Plaintiff's statements and made the conclusory statement that Plaintiff's subjective complaints were not credible [*id.*]. Moreover, Plaintiff argues the ALJ erred in basing his credibility determination on the fact that Plaintiff was able to perform minimal activities of daily living [*id.* at PageID# 69]. The Commissioner argues the ALJ thoroughly considered Plaintiff's allegations in comparison to the objective evidence in the record, which was more consistent with the ALJ's RFC determination [Doc. 18 at PageID# 84-85]. The Commissioner contends the evidence showed moderate mental limitations and mild physical impairments necessitating only routine and conservative treatment and were thus inconsistent with Plaintiff's subjective complaints of disabling conditions [*id.* at PageID# 85-86]. The Commissioner further argues Plaintiff's reports of his daily activities lent support to the ALJ's credibility determination, as Plaintiff lived alone, could take care of his personal needs, and performed some housekeeping activities [*id.* at PageID# 86]. The Commissioner notes the ALJ also considered Plaintiff's noncompliance with medication and inconsistent attendance at treatment appointments, which indicate Plaintiff's conditions were not as limiting as he alleged [*id.*]. The Commissioner argues the ALJ did make specific findings as to credibility and it was proper for the ALJ to consider his activities of daily living [*id.* at PageID# 87-88].

Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *See King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984) (noting the rule that an ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding," and holding it was error to reject uncontradicted medical evidence). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony"); *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) (ALJ's credibility assessment is entitled to substantial deference).

Plaintiff is correct that the ALJ made a somewhat conclusory statement about Plaintiff's credibility at the beginning of his decision, stating that "[a]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (Tr. 14-15). Later in his decision, however, the ALJ stated as follows:

> Regarding the claimant's credibility and activities of daily living, the claimant's testimony was not credible. The claimant described a back disorder with pain radiating into the upper and lower extremities. However, the only objective abnormality was a CT scan, which was meant to evaluate a hernia but was also noted to be "suspicious" for bulges at L3-4 and L4-5. There are no MRI or x-ray reports. Otherwise, the claimant has essentially received symptomatic treatment, chiefly medication refills, from primary care. The claimant has received routine and conservative treatment and has not undergone back surgery for his alleged back condition.
>
> The claimant testified to symptoms of post traumatic stress disorder

from multiple traumatic events many years ago. He described specific events in 1976 (his mother's death) and 1982 (one child was stillborn). Yet, he was able to work as a plumber and roofer despite these events. He did not begin seeking mental health treatment until about 2007. Treatment afterwards has been sporadic until August 2009, after he filed for disability. His current treatment consists of biweekly group therapy and medications at Centerstone Community Mental Health. The most recent Centerstone Community Mental Health note indicates his emotional/behavioral health was moderate and the claimant had a [GAF] of 55.

Further, I note the claimant's inconsistent statement [sic] throughout the record. He testified he has not looked for work since the onset date. Despite this, according to medical records from Volunteer Behavioral Health Care System, dated December 2008, he stated he was unable to get regular work. The claimant completed a Function Report-Adult form on July 12, 2009. He indicated that he did not need special reminders to take care of personal needs and grooming. He reported shopping and that he was able to pay bills, count change, handle a savings account and use a checkbook. The claimant testified that he lives alone in a camper trailer. He stated he completes his own housework. He owns a vehicle and is able to drive. He testified that he goes grocery shopping about two times a month. He indicated that he goes grocery shopping in the morning, which suggests that he apparently does not need to avoid crowds. He stated that he watches television and has a friend with whom he visits. . . . I note while the claimant reported that he lives alone, he has not reported any particular help with maintaining the residence. Also, the claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms. A review of the claimant's earnings record reveals the claimant has a poor work history, which raises the question as to whether the claimant's continuing unemployment is actually due to medical impairments. Treatment notes from Tri County Community Services document the claimant was not entirely compliant with taking prescribed medications for treatment. Also, as noted above, treatment notes from Centerstone Community Mental Health reveal the claimant missed several treatment appointments, which indicates non-compliance.

(Tr. 18-19).

I **FIND** this detailed explanation fulfilled the ALJ's duty to evaluate Plaintiff's credibility.

The ALJ pointed out inconsistencies between Plaintiff's subjective complaints and the objective evidence in the record, noted Plaintiff's sporadic treatment for mental health symptoms, cancelled appointments, and non-compliance with some medications for his impairments, summarized Plaintiff's daily activities, and reached the conclusion that Plaintiff's statements were not entirely credible. The ALJ's decision makes clear that he considered the entire record in reaching his credibility determination, and there is little objective evidence in the record to contradict this finding. As one example, the CRG assessments from Centerstone indicate far more severe mental impairments (which were similar to Plaintiff's complaints), but the assessments were not made by an acceptable medical source, appear to have been filled out on the basis of Plaintiff's subjective complaints and, as the ALJ noted, Plaintiff's last treatment notes indicate improvement and only moderate mental health symptoms. Moreover, as part of his consideration of the whole record, the ALJ could reasonably consider Plaintiff's reported activities of daily living. Plaintiff's testimony at the hearing was essentially in line with the statements made on his function report, and there is no indication the ALJ gave any of Plaintiff's reported daily activities any undue or unreasonable weight (or exaggerated them unreasonably) in assessing credibility. I therefore **FIND** the ALJ made no error in addressing Plaintiff's credibility and **CONCLUDE** the ALJ's decision that Plaintiff's subjective complaints were not fully credible is supported by substantial evidence.

Accordingly, and after considering all Plaintiff's arguments, I **CONCLUDE** the decision of the ALJ was supported by substantial evidence.

## V.    CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I

**RECOMMEND** that:[3]

>    (1)    Plaintiff's motion for judgment on the pleadings [Doc. 15] be **DENIED**.

>    (2)    The Commissioner's motion for summary judgment [Doc. 17] be **GRANTED**.

>    (3)    The Commissioner's decision denying benefits be **AFFIRMED**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order.  *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).